UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MARK REEVES, | ) | CASE NO. 3:13CV1425 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF | ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Anthony Mark Reeves ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

I. **PROCEDURAL AND FACTUAL HISTORY**

Plaintiff applied for DIB and SSI on May 27, 2010, alleging disability since October 1, 2009. Tr. at 144-154. Plaintiff's date last insured is June 30, 2012. Tr. at 13. The SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 81-94, 103-115. Plaintiff requested an administrative hearing, and on January 9, 2012, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff and Charles McBee, an impartial vocational expert ("VE"). Tr. at 32-75. On February 8, 2012, the ALJ issued a Decision denying benefits. Tr. at 15-27. Plaintiff appealed the Decision, and on May 1, 2013, the Appeals Council denied review. Tr. at 1-6.

On June 28, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On December 2, 2013, with leave of Court, Plaintiff filed a brief on the merits. ECF Dkt. #16.

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue.

On February 18, 2014, with leave of Court, Defendant filed a brief on the merits. ECF Dkt. #18. A reply brief was filed on March 4, 2014. ECF Dkt. #19.

**II.**     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from degenerative disc disease of the cervical spine with left arm radiculopathy, status-post previous posterior spinal fusion at C5-C6, tremor in both hands of unknown origin, hypertension, and depression, which qualified as severe impairments under 20 C.F.R. §404.1520(c) and 416.920(c). Tr. at 13. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 13-14.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), except that he can only engage in occasional overhead reaching with his left arm, occasional handling of objects with his left hand, and occasional fingering (fine manipulation) with his left hand. Plaintiff must be permitted to periodically alternate between sitting and standing while at his workstation and attending to work tasks. He is limited to simple, repetitive tasks, and only occasional interaction with the public. Tr. at 15-16.

The ALJ ultimately concluded that, although Plaintiff could not perform his past relevant work as a dump truck operator, mold setter, machine operator, painter, counter top maker, or fork lift driver, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of blending tank helper, thermal surfacing machine attendant, and school bus monitor. Tr. at 22. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

**III.**     **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1.     An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

-2-

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the

-3-

record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.    ANALYSIS

Plaintiff advances three arguments in this appeal.  First, Plaintiff contends that the ALJ erred when he did not give controlling weight to the opinion of Plaintiff's treating physician regarding his limitations.  Second, Plaintiff argues that the ALJ erred in giving great weight to the opinions of the agency physicians. Finally, Plaintiff contends that the ALJ erred in not incorporating the limiting effects of Plaintiff's severe and non-severe impairments into the RFC.

### A.    Medical history

Plaintiff received sporadic general medical care at Bryan Medical Group from 2000 to 2005. Tr. at 329-331. For instance, on October 13, 2004, Plaintiff complained of ringing in his ears for three days, but he explained that he worked in a loud factory and played drums in a band. Tr. at 330. Plaintiff's examination yielded normal results and his ears were clear.

On May 22, 2006, Plaintiff was admitted to Parkview Health Center with chest pain, nausea. vomiting, and disequilibrium. Tr. at 366-371. He reported smoking "heavily" and his blood pressure was "quite high." Tr. at 375. Plaintiff  was discharged the following day after a stress test revealed equivocal inferior ST changes at seven minutes and a heart rate of 133.  Tr. at 366.  Plaintiff was diagnosed with hypertension and his discharge medications included Zestril, Toprol, Lipitor, and Aspirin, 81 mg to be taken daily. He was referred for a stress test. Tr. at 367.  A catheterization performed on May 23, 2006 revealed early diffuse three vessel nonobstructive coronary artery disease, normal global and segmental left ventricular function, and no evidence of renal artery stenosis. Tr. at 373.  At the hearing, Plaintiff testified that he suffers ongoing chest pain from a heart attack in 2005 or 2006. Tr. at 39.

-4-

On August 10, 2007, Plaintiff sought treatment for ear and neck pain with Nicolas Finley, M.D., at the Butler Clinic. Tr. at 377-78. Dr. Finley attributed Plaintiff's ear ringing and pain to either his drum playing in a band or to his daily consumption of large doses of aspirin. Tr. at 378. Dr. Finley advised Plaintiff to stop taking aspirin for his neck pain and suggested Tylenol for pain relief. Dr. Finley furthered opined that Plaintiff's neck pain was the result of cervical disk disease. He prescribed steroid injections to relieve the pain, but Plaintiff refused treatment. Therefore, Dr. Finley prescribed Flexeril and Ultram and also recommended heat and massage treatment.

On December 28, 2009, Plaintiff saw Paula Sprow, MSN, CRNP, at the Compassion Medical Clinic for his high blood pressure and neck pain.  Tr. at 333. Plaintiff complained of neck pain and stated that he experienced numbness in his left arm when his neck pain flairs. Ms. Sprow did not find any abnormalities in Plaintiff's neck and noted that he had a full range of motion. Plaintiff said he was taking aspirin for his neck pain and Ms. Sprow recommended that he limit his aspirin intake to 325 mg per day and recommended that he supplement his pain regimen with Extra Strength Tylenol.  Plaintiff admitted that he had never taken Tylenol for his neck pain.  Ms. Sprow also recommended stretching exercises for his neck and alternating ice and heat..  She increased Plaintiff's blood pressure medication and advised him to follow up with her in three months.

Five months later, in May 2010, Plaintiff sought treatment at the Community Hospital and Wellness Center at Bryan Hospital for neck pain and numbness in his left arm. Tr. at 335. He stated that he had neck surgery in 1990 for a fracture he sustained in a car accident. Tr. at 338. He was diagnosed with cervical radiculopathy and prescribed Darvocet and a soft cervical collar.  Tr. at 335-36.

A CT scan of Plaintiff's cervical spine performed on May 24, 2010 showed degenerative spondylosis with marginal spurs at multiple levels and disc degeneration with post-surgical changes at C5-C6.  Tr. at 341. There was also evidence of reversal of normal lordotic curve that may have been caused by a muscular spasm. However, there was no evidence of acute fractures, dislocations, disc herniation, or spinal stenosis. Charles G. Felix, M.D., the physician that reviewed Plaintiff's CT scan, observed no new changes to Plaintiff's lumbar spine and diagnosed degenerative disk

disease. Tr. at 339. Plaintiff was advised to follow up with his family physician and undergo physical therapy. Tr. at 339. Plaintiff did not seek any treatment for a little more than one year.

Consultative examiner, Neil Shamberg, Ph.D., examined Plaintiff on September 3, 2010. Tr. at 384. Although Plaintiff did appear to be depressed and agitated, Dr. Shamberg noted that he was polite, deferential, and cooperative throughout the entire evaluation. Tr. at 384. Dr. Shamberg also noted that, although Plaintiff complained of depression and "hearing a voice calling his name," he had never taken any anti-depressant or psychiatric medications, nor had he ever sought mental health treatment or consulting. Tr. at 384, 386. In fact, Plaintiff's only reported medication at the time of his consultative examination was for his hypertension. Tr. at 385. Plaintiff indicated that he was depressed because his father and best friend both died that year and he was angry because he was unable to find a job. Tr. at 384, 386.

Plaintiff's speech was clear and coherent, and his affect was flat. Tr. at 386. He denied any suicidal ideation and did not manifest any manic traits. Plaintiff also did not display any overt signs of anxiety. Tr. at 387. His thought processes were logical, coherent, and goal directed, and he answered all of Dr. Shamberg's questions directly and succinctly. Tr. at 386. Dr. Shamberg opined that Plaintiff was of low average intelligence and diagnosed him with major depressive disorder, bereavement, anxiety disorder, nicotine dependence, and alcohol abuse. Tr. at 388.

Dr. Shamberg further opined that Plaintiff had marked limitations in his ability to relate to others and in his ability to withstand the stress and pressures associated with day-to-day work, and moderate limitations in his ability to understand, remember, and follow instructions and in his ability to maintain attention, concentrations, persistence, and pace. Tr. at 389. Dr. Shamberg assigned a Global Assessment of Functioning ("GAF") score of forty-one.[2] Tr. at 388.

Consultative examiner, Lamberto Diaz, M.D., examined Plaintiff on February 16, 2011, roughly six month after Dr .Shamberg's assessment. Tr. at 401. Dr. Diaz noted that Plaintiff claimed

---

[2]The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and is used by a clinician to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R) 34 (4th ed. 2000). A GAF score between forty-one and fifty indicates that the individual has "serious symptoms." *Id.*

to have weakness in his left arm and loss of fine manipulation, although he did not have any musculature defects or muscle atrophy. Dr. Diaz questioned whether Plaintiff was malingering. Tr. at 403. Although Plaintiff claimed he could not carry a gallon of milk with his left hand, Dr. Diaz observed that his musculature was well preserved.

Dr. Diaz noted that Plaintiff had a slightly reduced range of motion in his spine, but had normal range of motion in all his upper and lower extremities.  Tr. at 398-400. Plaintiff also had difficulties with his grasp, manipulation, pinch and fine coordination in his non-dominant left hand. Tr. at 397.

Dr. Diaz checked off both the "abnormal" and "normal" boxes for Plaintiff's ability to grasp, manipulate, pinch, and perform fine coordination with his right hand. Tr. at 397. This appears to be a mistake because checking both boxes for each task is contradictory and because Plaintiff has also only complained of manipulation difficulty with his left hand. Tr. at 401. However, Dr. Diaz did identify a marked tremor and grip weakness in both hands.  Tr. at 402.

Nonetheless, Dr. Diaz found that Plaintiff had normal muscle strength in his shoulders, elbows, wrists, fingers, hips, knees, feet and toes. Despite the inconsistencies that Dr. Diaz acknowledged in his examination notes, he opined, "With his current history, [Plaintiff] would not be suitable for sedentary work." Tr. at 403.  Dr. Diaz did not explain what Plaintiff's "current history" was or why Plaintiff was not suited for sedentary work.  Instead, he recommended further testing to determine if Plaintiff had a neurological or cord related defect, neuropathy from his alcoholism, or was, in fact, malingering. Tr. at 403.

On March 17, 2011, Plaintiff was seen by M. Stalter M.D. at Compassion Medical Clinic for neck pain. Tr. at 416. Upon examination, Dr. Stalter observed that Plaintiff had tenderness along his cervical spine and slightly reduced strength (four out of five) in his left arm. Dr. Stalter's physical examination did not reveal any focal abnormalities. Plaintiff was referred to orthopedic surgeon, Ashok Biyani, M.D., for consultation and treatment of his neck pain.

At Plaintiff's appointment with Dr. Biyani on May 25, 2011, Plaintiff indicated that he has had neck and left arm pain for 20 years resulting from spinal fusion surgery at C5-C6 following an automobile accident. Tr. at 405. Upon examination, Plaintiff had mild to moderate tenderness in his

-7-

cervical spine with a diminished range of motion. Plaintiff complained of radicular pain in his left arm, however, there was no gross motor sensory deficit found.  Dr. Biyani also reviewed Plaintiff's May 24, 2010 CT scan and determined that he had degenerative disc disease in his cervical spine and left arm radiculopathy. Dr. Biyani's prescribed physical therapy. Tr. at 406.

Plaintiff did not undergo physical therapy nor did he return to Dr. Biyani. Tr. at 414. Plaintiff did return to the Compassion Medical Clinic on November 7, 2011 seeking assistance with his Social Security Disability forms and because he was suffering from diarrhea. When asked why he did not undergo physical therapy as recommended by Dr. Biyani, Plaintiff indicated that he, "did not think physical therapy would work." Tr. at 414. When asked why he did not return to Dr. Biyani, Plaintiff indicated that he did not remember.  Plaintiff was told that the clinic did not fill out Social Security forms and he was advised to take Metamucil, Pepto-Bismol and Imodium to treat his diarrhea.

Plaintiff met with counselor David Brown, P.C.C., at Maumee Valley Guidance Center on January 31, 2011. Tr. at 427. Plaintiff indicated that he wanted outpatient counseling to help with his anger management and binge drinking. He explained that he was struggling emotionally after losing his two best friends, one from an overdose and another that had committed suicide. He reported difficulty controlling his anger for the previous two years.  Plaintiff has three children with whom he had no contact.

Plaintiff did not report – nor did Mr. Brown observe – any hallucinations, delusions, memory impairment, motor retardation, speech disorder, grooming concerns, or inappropriate affect. Mr. Brown diagnosed Plaintiff with Adjustment Disorder with mixed anxiety and depressed mood and assessed his GAF score[3] at fifty-one.

At an appointment with Mr. Brown on March 16, 2011, Plaintiff reported a domestic dispute with his girlfriend and an altercation with police.  Tr. at 429.  He was not arrested because he was given an opportunity to leave the house and gain his composure.  He had been drinking vodka prior to the incident.

---

[3] A GAF score between 51-60 indicates that the individual has "moderate symptoms. DSM-IV-R at 34.

Plaintiff met with Enedina Berrones, M.D., at Maumee Valley Guidance Center on April 5, 2011. Tr. at 431. Dr. Berrones noted that Plaintiff was cooperative, calm, and displayed appropriate behavior. Tr. at 432. He was also oriented to person, place, and time, and his speech, thought process, and thought content were all normal. Plaintiff did not have any suicidal or homicidal ideation and his judgment and insight were fair. Tr. at 432-33.

Plaintiff admitted that he had been arrested three times – once for domestic violence and twice for driving while intoxicated. Tr. at 432. At least one of his convictions resulted in incarceration for one month.

Dr. Berrones advised Plaintiff to continue with counseling once per month and assigned a GAF score of fifty-one to sixty. Tr. at 433. Dr. Berrones saw Plaintiff again on April 29, 2011 reached the same conclusion regarding Plaintiff's GAF score. Tr. at 434. She prescribed Celexa to treat Plaintiff's depression. Tr. at 435.

Plaintiff did not return for counseling until June 24, 2011. Tr. at 436. Dr. Berrones once again assessed Plaintiff GAF score at fifty-one to sixty. Tr. at 437. Based upon Plaintiff's complaints of nightmares while taking the Celexa, Dr. Berrones changed his medication to Zoloft and Trazadone. Plaintiff was advised to follow up in one month, however, he did not seek treatment again until September 7, 2011 when he met with Mr. Brown. Tr. at 437-38. Mr. Brown noted that Plaintiff was making progress. Tr. at 438.

Plaintiff's last counseling session was November 30, 2011, and, once again, he was cooperative, in no acute distress, and his behavior was appropriate. Tr. at 439. His speech, thought content, and thought process were all normal. Tr. at 439. While he did appear depressed, he had no suicidal or homicidal ideation and his judgment and insight were fair. Tr. at 439. He also did not have any perceptual disturbances and his attention and concentration were sustained. Tr. at 439. Dr. Berrones again assessed Plaintiff's GAF score at fifty-one to sixty, continued his medication, and advised him to follow up with her in three months. Tr. at 440.

### B.     Hearing testimony

Plaintiff, who was forty-four years of age at the hearing, and forty-two years of age on the alleged onset date, testified that he is divorced with three children. Tr. at 33. He lives with his

girlfriend and her daughter in his girlfriend's mobile home. Tr. at 34. Plaintiff completed the eleventh grade. His last job was at a grocery store that closed in November of 2007. Tr. at 35. Plaintiff's onset date is not predicated upon any particular injury or precipitating event that occurred on that date.

With respect to his pain, Plaintiff testified that his neck "pops" and "all [he] sees is purple." Tr. at 36. He testified that the pain feels like he "grabbed a hold of the light socket. Not very pleasant." Tr. at 36. Plaintiff further testified that he sleeps two to four hours straight "if [he's] lucky." Tr. at 37. He is not comfortable sitting or laying down, which makes his legs numb. Plaintiff testified that if he "twist[s] wrong" or he "lay[s] wrong," he fears paralysis in both legs. Tr. at. 38. His left knee locks. Tr. at 39. He conceded that he does not take pain medication but contends that medication does not alleviate his pain. Tr. at 35.

Plaintiff also suffers numbness in his left arm, which he attributes to lost muscle mass following the removal of plates removed from his arm after a roller skating accident. Tr. at 37. The numbness in his arm lasts for two or three hours and restricts his ability to "do anything." Tr. at 37.

Plaintiff testified that he suffers from nausea as a side effect of his hypertension medication. Tr. at 39. He further testified that his vomiting "pops the vessels in [his] eyes sometimes." Tr. at 40. The medication also makes his skin itch.

Plaintiff suffers from chronic diarrhea. He testified that he defecates ten or fifteen times a day. Tr. at 57. He does not take prescribed medication for these problems but uses over-the-counter products like Metamucil and Pepto-Bismol. Tr. at 58.

Plaintiff testified that he drinks alcohol to help him sleep. Although he struggles to control his alcohol consumption, he has not sought treatment for alcohol addiction. Plaintiff lost his license after "the lady at the Dairy Queen smelled beer on [him] and called the law." Tr. at 43. He has not attempted to reinstate the license because he is afraid to drive, due to his inability to turn his body. Tr. at 44.

Plaintiff testified that he has difficulty remembering things. Tr. at 44. He also has difficulty reading because the letters and words transpose themselves on the page. Tr. at 44-45. Plaintiff

-10-

receives treatment for his depression at Maumee Valley Guidance, but the medication that he is prescribed provides no relief from his symptoms. Tr. at 41.

With respect to the level and duration of his pain, Plaintiff testified that there are times where "[he is] just shot for two or three days" and he will "just lay around for two or three days." Tr. at 45. He further testified that the last three years have "really beaten [him] hard." Tr. at 47.

Plaintiff testified that he can walk one and a half blocks. Tr. at 48. He can no longer walk his dog. Tr. at 48. He cannot stand or sit for longer than fifteen minutes. Tr. at 49-50. He cannot lift a gallon of milk with his left hand, but can lift with his right hand if he does so carefully. Tr. at 49. However, lifting more than five pounds hurts his neck. Tr. at 51. Plaintiff also has difficulty picking up small objects with his left hand. Plaintiff has difficulty feeding himself. Tr. at 53. At home, he will occasionally wash dishes, but no longer washes glasses. Tr. at 54. Plaintiff spends some portion of his day on the computer, although he has difficulty hitting the correct keys. Tr. at 55. Plaintiff smokes a pack of cigarettes every three days. Tr. at 56.

### C. Agency physicians

On August 25, 2010, state agency physician, Willa Caldwell, M.D., reviewed Plaintiff's medical records and opined that he retained the ability to perform a reduced range of light work. Tr. at 81-83. Dr. Caldwell found that, despite Plaintiff's impairments, he was still able to lift twenty pounds occasionally and ten pounds frequently, and stand, sit, and/or walk six hours in an eight hour day. Tr. at 81-82. She also found that Plaintiff was limited to occasional pushing, pulling and overhead reaching with his left arm and also limited to occasional climbing or ladders, ropes, and scaffolding. Tr. at 82. However, she found he was unlimited in his ability to climb ramps and stairs; balance; stoop; kneel; crawl, and crouch. Finally, Dr. Caldwell found that Plaintiff did not have any manipulative, visual, communication, or environmental limitations.

On March 14, 2011, state agency physician, Lynne Torello, M.D., reviewed Plaintiff's medical records and opined that Plaintiff could perform a reduced range of light work. Tr. at 110-12. She found that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, and could sit, stand, and/or walk six hours in an eight hour day. Tr. at 110. Dr. Torello also found that Plaintiff was limited to occasional pushing, pulling, and overhead reaching with his left arm. She found that

Plaintiff had postural limitations, as well, and could never climb ladders, ropes, or scaffolds and could only occasionally crouch. Tr. at 111. However, Plaintiff was not limited in his ability to climb stairs or ramps, stoop, or kneel. Finally, Dr. Torello found that Plaintiff was limited in his ability to perform fine and gross manipulation with his left hand and that he should avoid concentrated exposure to vibrations, and avoid moderate exposure to dangerous machinery, and heights. Tr. at 111-112.

On October 19, 2010, state agency psychologist, Melanie Bergsten, Ph.D., reviewed Plaintiff's medical records. Tr. at 96-98. She opined that Plaintiff was only moderately limited in his ability to get along with co-workers and interact with the public; in his ability to accept instructions; in his ability to respond appropriately to changes in the work setting; and in his ability to complete a normal workday. Tr. at 89-97. She discounted the opinion of Dr. Shamberg because she found that his opinion was without substantial support from other evidence of record. Dr. Bergsten found that Plaintiff remained capable of performing work-related tasks in situations where duties are relatively static and changes can be explained. Tr. at 98.

On April 11, 2011, state agency psychologist, John Waddell, Ph.D., reviewed Plaintiff's medical records. Tr. at 108-110. He opined that Plaintiff had mild limitations in his activities of daily living; moderate limitations in his ability to maintain social functioning and in his ability to maintain concentration, persistence, or pace; and no episodes of decompensation. Tr. at 108. Dr. Waddell also found that Plaintiff's statements regarding the intensity, persistence, and functionally limiting effects of his symptoms was not substantiated by the objective medical evidence, and, therefore, Plaintiff's statements were only partially credible. Tr. at 109.

Like Dr. Bergsten, Dr. Waddell also found the opinion of consultative examiner, Dr. Shamberg, was only entitled to partial weight because the objective medical evidence did not support that Plaintiff had more than a moderate degree of impairment in his ability to relate to others and tolerate stress. Tr. at 114. Finally, Dr. Waddell also opined that Plaintiff was able to perform work-related tasks in situations where duties are relatively static. Tr. at 114.

### D.     The ALJ's decision

The ALJ gave great weight to the physical and mental assessments of the agency physicians because he found that they were consistent with the record as a whole. Tr. at 21. The ALJ accorded some weight to the opinion of consulting examiner, Dr. Diaz. The ALJ credited Dr. Diaz's conclusion that Plaintiff's allegations of debilitating pain were inconsistent with the objective medical testing in the record, but discounted his opinion that Plaintiff could not perform the full range of sedentary work. The ALJ relied upon Dr. Diaz's confessed inability to determine whether Plaintiff's symptomology was related to a neurologic condition or whether it was related to his alcoholism or malingering. Tr. at 20. The ALJ gave little weight to the opinion of consulting examiner, Dr. Shamberg as it "was not reflective of Plaintiff's functional capacity as [Plaintiff] has not sought treatment." Tr. at 20.

### E.     Treating physician rule

Plaintiff first argues that the ALJ failed to comply with the treating physician's rule because he provided no assessment of Dr. Biyani's opinion regarding Plaintiff's cervical rotation, flexion, and extension. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

-13-

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Commissioner of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010). For example, where an ALJ failed to describe "the objective findings that were at issue or their inconsistency with the treating physician opinions," remand has been ordered. *Barrett v. Astrue*, 2011 WL 6009645, at *6 (E.D.Ky. Dec.1, 2011). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).

Here, Dr. Biyani observed that Plaintiff has a diminished range of motion including flexion, extension, and rotation. Tr. at 405. First, it is important to note that, although Dr. Biyani is a treating source, he only saw Plaintiff on one occasion. The length of treatment is one factor the ALJ

-14-

may consider in assigning weight to a physician's opinion. Of equal import, Dr. Biyani's statement is vague, offering no clear conclusion regarding the degree of Plaintiff's limitation resulting from his diminished range of motion. Finally, several of the medical opinions in the record acknowledged Plaintiff's degenerative disc disease, and, as a consequence, Dr. Biyani's opinion was duplicative. The ALJ ultimately recognized Plaintiff's spinal problems and included an accommodation in the RFC.

The Sixth Circuit observed in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541(6th Cir.2004) that, in some circumstances, a violation of the rule might be "harmless error" if (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2) – the provision of the procedural safeguard of reasons – even though [s]he has not complied with the terms of the regulation." *Id.* at 547. Here, the ALJ has adopted Dr. Biyani's opinion with respect to Plaintiff's diminished range of motion in his cervical spine, by limiting him to a modified range of light work. Accordingly, the undersigned recommends that the Court find that Plaintiff's first argument in regard to the treating physician rule does not have merit.

### F.      Weight of opinion evidence

Next, Plaintiff argues that the ALJ erred in crediting the opinions of the agency physicians and the psychological consultants. The ALJ explained that he gave great weight to the agency physicians' opinions because they were consistent with the record as a whole. Tr. at 21. State agency consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." See 20 C.F.R. §404.1527(f)(2)(I).

Here, the ALJ correctly concluded that the opinions of the agency physicians were supported by the record. First, the objective medical testing in the record does not support Plaintiff's claim of debilitating pain. Although Plaintiff was frequently diagnosed with degenerative cervical disk disease, his CT sans revealed no disc herniation or spinal stenosis. Examinations revealed only moderate tenderness and moderately diminished range of motion. Moreover, throughout the record,

-15-

Plaintiff received conservative treatment from his treating physicians. For instance, Dr. Biyani recommended physical therapy for Plaintiff's neck pain.

Second, Plaintiff consistently ignored the recommendations of his physicians. In fact, Plaintiff did not undergo physical therapy, as recommended by Dr. Biyani, because he did not think it would work. Tr. at 414. Likewise, Dr. Finley recommended steroid trigger point injections, which Plaintiff refused to undergo. Plaintiff was told by Dr. Finley to stop taking large amounts of aspirin, and to take Tylenol instead. Two years later, when Ms. Sprow advised Plaintiff to limit his aspirin intake and take Tylenol in its place, he admitted that he had never taken Tylenol.

Third, at the hearing, Plaintiff testified that he takes no pain medication because it does not alleviate his pain. It is well settled that "[i]n the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain." *Strong v. Soc. Sec. Admin.*, 88 Fed.Appx. 841, 846 (6th Cir.2004), citing *Williams v. Bowen*, 790 F.2d 713, 715 (8th Cir.1986). Here, Plaintiff sought treatment but disregarded the medical advice provided to him.

With respect to his mental problems, Plaintiff was routinely assigned GAF scores in the fifty-one to sixty range by treating physician, Dr. Berrones, reflecting only moderate symptoms. Furthermore, as the ALJ also acknowledged, Plaintiff's activities of daily living are inconsistent with his allegations of debilitating pain and difficulty in social functioning. Plaintiff claims that he has dexterity problems but he is a drummer in a band. Plaintiff contends that he is uncomfortable in crowds and in small rooms, but his participation in the band belies both of those alleged problems.

In addition to arguing that the agency physicians' opinions were not entitled to great weight, Plaintiff also contends that the opinions were in conflict, and, therefore, could not have each been given great weight. Plaintiff argues that Dr. Caldwell assigned push/pull and climbing restrictions but Dr. Torello assigned push/pull, climbing, balancing, crawling, hazards, vibration, left overhead reaching, left handling, left fingering, and left feeling restrictions. See ECF Dkt. #16 at p. 19. Plaintiff contends that the ALJ failed to resolve these conflicts and provide sufficient reasoning to permit meaningful review. To the contrary, the ALJ incorporated several of the foregoing

limitations into the RFC. The ALJ was not required to incorporate all of the agency physicians' opinions the RFC in order to attribute great weight to their opinion, only those opinions which he concluded were supported by substantial evidence in the record.

Moreover, the VE identified three jobs that Plaintiff could perform even with his physical and mental impairments – blending tank helper, thermal surfacing machine attendant, and school bus monitor. Tr. at 64-76. Based on the Dictionary of Occupational Titles, Plaintiff would be able to perform these jobs despite the limitations imposed by Dr. Torello. The job of blending tank tender/helper does not require any fingering or feeling (fine manipulation) and only requires occasional reaching and handling, which is consistent with the ALJ's RFC assessment. See DICOT 520.687-066, 1991 WL 674063. There is also no exposure to vibrations, dangerous machinery, or heights, and no climbing or crouching is required. Likewise, the job of thermal surfacing machine attendant only requires occasional reaching, handling, and feeling. See DICOT 679.685-018, 1991 WL 678082. This job also does not have any exposure to dangerous machinery, heights or vibrations and does not require any climbing or crouching. Finally, the job of school bus monitor also does not require any climbing or crouching; does not have any exposure to vibrations, heights, or dangerous machinery; and does not require any reaching, handling, or fingering. See DICOT 372.667-042, 1991 WL 673102.

Accordingly, the undersigned recommends that the Court find that the ALJ did not err in giving great weight to the opinions of the agency physicians, because substantial evidence in the record supported their conclusions regarding Plaintiff's limitations. As a consequence, the undersigned recommends that the Court find that Plaintiff's second argument in regard to the credit given to the opinions of the agency physicians and psychological consultants does not have merit.

### G. Failure to include limiting effects of impairments in the RCF

In his final argument, Plaintiff contends that the ALJ erred when he included a periodic sit/stand option in the RFC, failed to include a limitation based upon the tremor in Plaintiff's right hand, and failed to limit Plaintiff's exposure to his coworkers and supervisors to superficial contact. A claimant's RFC is the most that he can still do despite his functional limitations. 20 C.F.R. §404.154(a); SSR 96-8p. The assessment must be based upon all of the relevant evidence, including

-17-

the medical records and medical source opinions. 20 C.F.R. §404.1546(c). The final responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2). In determining RFC for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments including: mental and physical; exertional and nonexertional; and severe and nonsevere. See 42 U.S.C. §§423(d)(2)(B), (5)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir.1988).

While this Court reviews the entire administrative record, it "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir.1995)). See also *Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan.15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") Indeed, the Sixth Circuit has repeatedly upheld ALJ decisions where medical opinion testimony was rejected and the RFC was determined based upon objective medical and non-medical evidence. See e.g., *Ford v. Comm'r of Soc. Sec.*, 2004 WL 2567650 (6th Cir. Nov.10, 2004); *Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058 (6th Cir. Aug.18, 2009).

Plaintiff cites a Seventh Circuit case, *Arnett v. Astrue*, 676 F.3d 586 (7th Cir.2012), for the proposition that an RFC must be specific about the required frequency of standing and sitting. *Arnett*, citing SSR 96-9p, 1996 SSR LEXIS 6, at 18-19. However, based upon a review of cases in the Sixth Circuit, including a sit/stand option allowing for periodic position changes does not necessitate remand. See, e.g., *Hamilton v. Astrue*, 2013 WL 663626 (S.D. Ohio); *Caillet v. Astrue*, 2012 WL 4120383 (N.D. Ohio).

Next, Plaintiff asserts that the ALJ erred when he did not include limitations in the RFC based upon Plaintiff's right hand tremor. Plaintiff's right hand tremor was only documented by Dr. Diaz, whose conclusions regarding Plaintiff's limitations were internally inconsistent and at odds with the remainder of the record. Dr. Diaz checked off both the "abnormal" and "normal" boxes for Plaintiff's ability to grasp, manipulate, pinch, and perform fine coordination with his right hand.

-18-

Tr. at 397. Moreover, the ALJ gave little weight to Dr. Diaz's opinion regarding Plaintiff's limitations due to his confessed inability to determine whether Plaintiff's symptomology was related to a neurologic condition, his alcoholism, or malingering.

Finally, Both Dr. Bergsten and Dr. Waddell concluded that Plaintiff was moderately limited in his ability to interact with supervisors and co-workers. More specifically, Drs. Bergsten and Waddell found that Plaintiff was able to relate to a few familiar others on a superficial basis.  Tr. at 84, 97.  The ALJ did not include this limitation in the RFC despite giving the agency physicians' opinions great weight.  But there is no requirement that an ALJ discuss every piece of evidence. *Dickey–Williams v. Comm'r of Soc. Sec.*, 2013 WL 5476019, *7 (E.D.Mich.2013) (see generally *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 507–08 (6th Cir.2006) ("... an ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party.)  As previously stated, the ALJ may give great weight to some but not all of a medical opinion in the record.

Accordingly, the undersigned recommends that the Court find that the RFC fashioned by the ALJ in this case is supported by substantial evidence, and that Plaintiff's final argument does not have merit.

## **VI.    CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

DATE:  June 30, 2014

                                   */s/George J. Limbert*
                                    GEORGE J. LIMBERT
                                    UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).